**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| MAYOR AND CITY COUNCIL OF BALTIMORE,<br><br>        *Plaintiff*,<br><br>    v.<br><br>BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES,<br><br>        *Defendant*. | Civil Action No. 23-3762 (RDM) |

## <u>MEMORANDUM OPINION AND ORDER</u>

On September 12, 2023, Brandon Scott, the Mayor of the City of Baltimore, submitted a request for records, on behalf of the City, to the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") under the Freedom of Information Act ("FOIA"). The City's request, which contains four parts, seeks certain firearm trace records from ATF's National Tracing Center's Firearms Tracing System to identify the sources of guns recovered from crimes committed in the City. *See* Dkt. 1-1. Part 1 requests "[r]ecords sufficient to identify the federally licensed firearms dealers ('FFL') that are the top ten sources of firearms recovered in Baltimore from 2018 through 2022" and several statistics relating to those top-source FFLs. Dkt. 1-1 at 2. Part 2 requests "records sufficient to show, with respect to firearms recovered in Baltimore on an annual basis from 2018 through 2022, in connection with the category of offense or other circumstance of Homicide, Homicide-Attempted, Aggravated Assault, Robbery, Suicide, and Suicide-Attempted," the total number of firearms recovered in certain periods of time, the "total number of each firearm type by manufacturer, weapon type, and caliber," and the total number of firearms from each source state. *Id.* at 3. Finally, Parts 3 and 4 seek the "[u]nderlying data

related to ATF's recent report on trace data in Baltimore showing the 'Top Source Cities'" and the "Top Recovery Cities," or more specifically, "any tables or spreadsheets used to compile" those tables.  *Id.*  ATF refused to provide the records the City requested, invoking Exemption 3, which permits an agency to withhold records the disclosure of which is prohibited by statute.  5 U.S.C. § 552(b)(3).  The City responded by filing this suit on December 18, 2023.  *See* Dkt. 1.

Shortly thereafter, the National Shooting Sports Foundation, Inc. ("NSSF" or "the Foundation") moved to intervene, seeking to protect the interests of its member FFLs, who manufacture, distribute, or otherwise sell firearms.  *See* Dkt. 11.  The Court denied NSSF's motion to intervene as of right or permissively, concluding that the Foundation had failed to carry its burden of showing that it has Article III or statutory standing.  *See* Min. Order (March 4, 2024).  The Foundation lacked associational standing, the Court explained, because it had failed to identify any specific member that is likely to suffer a cognizable harm if the records at issue are released.  *Id.* (quoting *Chamber of Com. of U.S. v. EPA*, 642 F.3d 192, 199 (D.C. Cir. 2011)).[1]  The Court also held that NSSF lacked statutory standing because

> it is generally up to the agency to decide what FOIA exceptions to assert and a court cannot determine that an agency appropriately withheld records based on an exemption that the agency does not assert.  *Cf. Maydak v. U.S. Dep't of Just.*, 218 F.3d 760, 765 (D.C. Cir. 2000).  Here, NSSF seeks to intervene to argue that the withholdings were justified under Exemptions 4 and 6, Dkt. 11-3 at 13; Dkt. 23 at 11; exemptions that, to date, ATF has not asserted, Dkt. 1-2; Dkt. 14.  To be sure, a private party can object to an agency's failure to protect that party's trade secrets, but there are procedures for doing so, which, among other things, require the private party to bring a reverse FOIA case, which NSSF does not purport to do here . . . .

*Id*.  Without standing, NSSF cannot intervene as of right.  *See Fund For Animals, Inc. v. Norton*, 322 F.3d 728, 731–32 (D.C. Cir. 2003) ("[I]n addition to establishing its qualification for

---

[1] NSSF advanced no organizational-standing theory in its first motion for leave to intervene.

intervention under [Federal Rule of Civil Procedure] 24(a)(2), a party seeking to intervene as of right must demonstrate that it has standing under Article III of the Constitution.").

The Court also held that NSSF's lack of standing "foreclose[d] its motion for permissive intervention."  Min. Order (March 4, 2024).  The Court explained:

> Although the question of whether standing is required for permissive intervention has been described as "open" by the D.C. Circuit, *see In re Endangered Species Act Section 4 Deadline Litig.-MDL No. 2165*, 704 F.3d 972, 980 (D.C. Cir. 2013), the D.C. Circuit recently upheld a district court order denying a party's motion for permissive intervention on the ground that the proposed intervenor lacked standing, *see Yocha Dehe v. U.S. Dep't of the Interior*, 3 F.4th 427, 431-32 (D.C. Cir. 2021) ("Because Yocha Dehe does not currently satisfy the injury requirement of Article III standing, it lacks standing to intervene.  Accordingly, we affirm the judgment of the district court and do not reach Rule 24(a)(2)'s requirements or permissive intervention.")[;] . . . *EEOC v. Nat'l Children's Ctr., Inc.*, 146 F.3d 1042, 1046 (D.C. Cir. 1998) (explaining that "the putative intervenor must ordinarily present: (1) an independent ground for subject matter jurisdiction; (2) a timely motion; and (3) a claim or defense that has a question of law or fact in common with the main action" because "the typical movant asks the district court to adjudicate an additional claim on the merits").

*Id.*  The Court, accordingly, denied NSSF's motion to intervene as of right and "decline[d] in its discretion to find that permissive intervention [was] warranted."  *Id.* (citing *Aristotle Int'l, Inc. v. NGP Software, Inc.*, 714 F. Supp. 2d 1, 18 (D.D.C. 2010)).

NSSF renewed its motion to intervene two weeks later, this time seeking leave to file three supporting declarations under seal that, according to NSSF, identified specific members of the Foundation from Maryland and Ohio who would likely suffer a cognizable harm if the records were released.  Dkt. 25; Dkt. 26.  The City opposes the motion to intervene, once again challenging NSSF's standing, Dkt. 31; ATF has taken no position on NSSF's motion, Dkt. 17.  For the reasons that follow, the Court concludes that NSSF has remedied neither one of the two defects that the Court identified in its prior Order—that is, that the Foundation lacks statutory standing and Article III standing to intervene—and will therefore **DENY** NSSF's renewed

3

motion to intervene as of right, and the Court will also exercise its discretion to **DENY** NSSF's renewed motion for permissive intervention, Dkt. 26.  In addition, the Court will **GRANT** NSSF's motion for leave to file the three declarations under seal.  Dkt. 25.

## I.

The Court begins with the statutory standing issue.  As the Court noted in its Order denying NSSF's first motion to intervene, "it is generally up to the agency to decide what FOIA exceptions to assert and a court cannot determine that an agency appropriately withheld records based on an exemption that the agency does not assert."  Min. Order (March 4, 2024).  Here, in response to the City's FOIA request, the ATF invoked Exemption 3.  NSSF echoes that defense but, in doing so, it fails to offer any reason to conclude that the AFT will not adequately represent its interests with respect to Exemption 3, *see Fund for Animals, Inc. v. Norton*, 322 F.3d 728, 731 (D.C. Cir. 2003) (applicant for intervention as of right must show, inter alia, that its interest will not be adequately represented by an existing party).  That, however, is not all that NSSF seeks to argue; to the contrary, much of the amicus brief that it has already filed maintains that the records at issue are also exempt from disclosure under FOIA Exemptions 4, 6, and 7(C). Dkt. 34 at 18–24.

As the Court explained in its prior Order, NSSF lacks statutory standing to assert FOIA exemptions that the federal agency—here, the ATF—has not invoked.  FOIA is a disclosure statute, and nothing in FOIA itself requires an agency to withhold any records.  To be sure, other statutes, including the Trade Secrets Act, 18 U.S.C. § 1905, may preclude an agency from releasing certain confidential records, and that prohibition may be enforceable under the Administrative Procedure Act, 5 U.S.C. § 701(a).  *See Chrysler Corp. v. Brown*, 441 U.S. 281 (1979).  And, to be sure, courts have at time permitted interested parties to intervene in support

an agency's decision to withhold confidential information from disclosure pursuant to a specific FOIA exemption. *See Jud. Watch, Inc. v. Food & Drug Admin.*, 449 F.3d 141, 145 (D.C. Cir. 2006) ("The intervenors' affidavits supported the FDA's reasons for using Exemptions 4 and 6 to withhold information submitted to it during mifepristone's approval."); *Pub. Citizen Health Rsch. Grp. v. Food & Drug Admin.*, 185 F.3d 898, 900 (D.C. Cir. 1999). But it is an entirely different matter for a private party to seek leave to intervene in a FOIA action—without asserting its own reverse-FOIA claim pursuant to the APA or any other statute—to invoke FOIA exemptions that the agency has not itself invoked. If that party has a cause of action that it can assert against the agency, seeking to bar the agency from releasing the records, it can bring that suit. A private party cannot, however, step into the shoes of the agency and assert a discretionary exemption that the agency has not itself invoked. That is the problem with NSSF's efforts to invoke Exemptions 4, 6, and 7(C) that the Court identified in its prior Order, and nothing in NSSF's renewed motion overcomes, addresses, or even mentions that problem.

Because NSSF offers no answer to this fundamental problem with its effort to invoke FOIA exemptions that the agency has not itself invoked, the Court once again concludes that the Foundation lacks statutory standing (or a cause of action) to do so. FOIA Exemptions 4, 6, and 7(C) are not at issue in this litigation, and NSSF cannot change that fact by intervening as of right (and without bringing a reverse-FOIA action against the agency).

## II.

That leaves the question whether NSSF should be allowed to intervene merely to reargue the Exemption 3 argument pressed by the ATF. As noted above, the Foundation fails to explain why the ATF has not adequately represented its interests with respect to Exemption 3 and has thus failed to carry its burden of establishing that it is entitled to intervene as of right. *See Fund*

*for Animals, Inc.*, 322 F.3d at 731.  Even more importantly, NSSF has also failed to show that it has Article III standing.  That lack of standing precludes the Court from granting NSSF's motion for leave to intervene as of right, and, for the reasons explained below, *see* Part II.C., it either precludes or strongly counsels against granting NSSF's motion for permissive intervention.

When an organization, like NSSF, seeks to establish Article III standing, it may proceed in one of two ways: it may show that it has "organizational standing" to sue on its own behalf, or it may demonstrate that it has "associational standing" to sue on behalf of its members.  *See Public Citizen, Inc. v. Trump*, 297 F. Supp. 3d 6, 17 (D.D.C. 2018); *Crossroads Grassroots Pol'y Strategies v. Fed. Election Comm'n*, 788 F.3d 312, 316 (D.C. Cir. 2015) ("Article III standing is not a threshold determination that courts normally make before allowing a defendant to enter a case. . . .  But where a party tries to intervene as another defendant, we have required it to demonstrate Article III standing, reasoning that otherwise 'any organization or individual with only a philosophic identification with a defendant—or a concern with a possible unfavorable precedent—could attempt to intervene and influence the course of litigation.'" (quoting *Deutsche Bank Nat'l. Trust Co. v. FDIC*, 717 F.3d 189, 195 (D.C. Cir. 2013) (Silberman, J., concurring))).  In its renewed motion, NSSF pursues both avenues and fails in both efforts.

### A.

The Court starts with associational standing, which is premised on the theory that the organizational plaintiff is not seeking a remedy on its own behalf but, rather, is proceeding "as the representative of its members."  *Warth v. Seldin*, 422 U.S. 490, 511 (1975).  As such, the organization need not establish that it has standing to sue in its own right, but must show (1) that at least one of "its members would otherwise have standing to sue in [her] own right," (2) that the interests that the association "seeks to protect" in the litigation "are germane to the

organization's purpose," and (3) that "neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977).  NSSF's associational standing arguments fail at the first step:  NSSF has failed to demonstrate that at least one of its members would have standing to sue (or to defend against the Mayor's claim) in her own right.  *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992) (explaining that an individual has satisfied the "irreducible constitutional minimum of standing" when that individual demonstrates that (1) she has or will experience "an injury in fact . . . which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical," (2) that there is "a causal connection between the injury and the conduct complained of," and (3) that it is "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision").

### 1.

NSSF first contends that at least one of its members has standing to defend the ATF's decision to withhold the records the City seeks because "[t]here is a substantial likelihood that one or more of NSSF's member FFLs will be identified in connection with one or more traces responsive to Baltimore's FOIA requests" and that the identification of those FFLs will be harmful to the FFLs' reputations and pocketbooks.  Dkt. 26-1 at 12.  In advancing this argument, NSSF does not contend that any of its members have already suffered an injury as a result of the City's FOIA request; nor could it, as the City's FOIA request at this point has not resulted in the disclosure of any materials.  Instead, NSSF argues that at least one of its member FFLs (or one of its members that owns or operates an FFL) faces a risk of a future injury if the documents the City requests are released.

As the D.C. Circuit has explained, any party "alleging only future injuries confronts a significantly more rigorous burden to establish standing." *United Transp. Union v. ICC*, 891 F.2d 908, 913 (D.C. Cir. 1989). To establish standing, the party "must demonstrate that the alleged future injury is 'imminent.'" *Chamber of Com.*, 642 F.3d 192, 200 (D.C. Cir. 2011) (quoting *Bennett v. Spear*, 520 U.S. 154, 167 (1997)); *see Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990) ("Allegations of possible future injury do not satisfy the requirements of Art. III[;] [a] threatened injury must be certainly impending to constitute injury in fact." (internal quotation marks omitted)). To "shift[ ] injury from 'conjectural' to 'imminent,' the petitioners must show that there is a 'substantial . . . probability' of injury." *Id.* (quoting *Sherley v. Sebelius*, 610 F.3d 69, 74 (D.C. Cir. 2010)). NSSF attempts to demonstrate this probability of injury in two ways.

First, it proffers declarations from three owners or operators of FFLs, two of which do business in Maryland, Dkt. 25-1 at 1; Dkt. 25-3 at 1, and one of which is in Ohio, Dkt 25-2 at 1. These declarants attest that their FFLs have "complied with all reporting requirements imposed by federal law," including "responding to all requests from the ATF and the National Tracing Center for information associated with firearms tracing." Dkt. 25-1 at 2; Dkt. 25-2 at 2; Dkt. 25-3 at 2. They each also explain that "[b]eing named in any such disclosure would cause me and my business reputational harm as a result of being associated with one or more "crime-gun" traces." Dkt. 25-1 at 2; Dkt. 25-2 at 2; Dkt. 25-3 at 2.

But no NSSF member attests that he or she—or that an FFL that he or she owns or operates—provided relevant gun tracing information to the ATF during the relevant period (2017 onward) or that he or she expects that his or her FFL will be named in the agency's response to the City's FOIA request. They merely state that *if* their FFL were to be named in ATF's response to the City's FOIA request, they believe they would suffer reputational harm. This is

far too speculative to constitute the type of "imminent" harm necessary to constitute an injury-in-fact for Article III standing purposes. *See La. Envtl. Action Network v. Browner*, 87 F.3d 1379, 1384 (D.C. Cir. 1996) (holding that the petitioner's claim that "dire consequences . . . would befall it if" certain events were to transpire was insufficient to "state an injury sufficiently imminent and concrete for constitutional standing"); *Chamber of Com.*, 642 F.3d at 202 (finding declarations that stated merely that harm "could" or "may" occur too equivocal to demonstrate an injury-in-fact).

NSSF also submits a survey of its member FFLs in Alabama, Delaware, Florida, Georgia, Kentucky, Maryland, North Carolina, Ohio, Pennsylvania, South Carolina, Texas, Tennessee, Virginia, and West Virginia. Dkt. 26-2 at 4 (Fatohi Decl. ¶ 17). These states were selected because it is NSSF's understanding that they, "along with the District of Columbia, are the top 15 sources of firearms traced and recovered in Maryland for 2022." *Id.* at 4 n.1 (Fatohi Decl.). NSSF asked respondents a range of yes/no questions, including whether they had received to a trace request from the ATF since 2017 (203 yes; 76 no); whether "being publicly identified as an FFL connected to one or more traces [would] create the misimpression that you or your business engaged in criminal or other wrongdoing" (253 yes; 27 no); and whether "any such misimpression" would harm the "reputation or your business" (251 yes; 2 no), "cause you or your business to suffer economic harm" (252 yes; 1 no), or "cause you to incur increased costs" (237 yes; 16 no). Dkt. 26-3 at 2–3 (NSSF 2024 Survey).

NSSF argues that the answers to these questions show that "NSSF's members include one or more FFLs who are virtually certain to be included in connection to at least one of the traces Baltimore seeks" and that this identified FFL will face harm as a result. Dkt. 26-1 at 14. This is because Parts 3 and 4 of the City's FOIA request are, in NSSF's view, "broad[ly]

word[ed]" to "quite literally request[] every trace for every crime gun with a known purchaser that was recovered in Baltimore between 2017 and 2021." *Id.* at 13. As a result, NSSF argues that the fact that any of its members from states that are top source states for crime guns recovered in Baltimore answered a trace request from the ATF since 2017 makes it likely that at least one of these members will be identified in ATF's response to the City's FOIA request.

But the City itself disavows this reading of its request. In its opposition to NSSF's motion to intervene, the City explains that Parts 3 and 4 of its request do "not seek records of individual firearm transactions or the data that could be used to reconstruct individual firearms transactions." Dkt. 31 at 22. Nor do Parts 3 and 4 of the FOIA request "seek information that could reasonably be expected to interfere with law enforcement investigations," "information that would infringe on personal privacy," or "to connect any one gun to any particular crime." *Id.* at 22 & n.9. To the extent there is any doubt about the scope of the request, moreover, the ATF is entitled to hold the City to that representation. Thus, Parts 3 and 4 of the City's request are not seeking "every trace for every crime gun with a known purchaser," which would identify individual FFLs who responded to trace requests from the ATF since 2017.[2]

To be sure, Part 1 of the City's FOIA does request "[r]ecords sufficient to identify the federally licensed firearms dealers ('FFL') that are the top ten sources of firearms recovered in Baltimore from 2018 through 2022." Dkt. 1-1 at 2. But the Court cannot discern from NSSF's

---

[2] The Court also notes that Part 3 of the City's FOIA request seeks the "tables or spreadsheets used to compile" charts in "ATF's recent report on trace data in Baltimore showing the 'Top Source Cities.'" Dkt. 1-1 at 3. That chart showed that five cities in Maryland were the "Top Source Cities." Dkt. 26-4 at 3 (Baltimore, Glen Burnie, Timonium, Halethorpe, Hanover). Only 13 of the 280 FFL respondents to NSSF's survey are located in Maryland. Dkt. 26-3 at 1. The record does not reveal whether any of those 13 respondents are located in the five cities in Maryland that are the top source cities. According to NSSF's own declarations, none of the three declarants are located in one of the five top source cities. *See* Dkt. 25-1 at 1; Dkt. 25-3 at 1.

survey responses whether any of NSSF's members are likely to be identified as such a source. NSSF's survey indicates that the majority of the respondents to its survey had received gun trace requests from the ATF since 2017.  It is does not show, however, that NSSF's survey respondents make up the majority (or even a significant portion) of the FFLs in the relevant areas.  And it certainly does not offer any reason to believe that any of the respondents—or any other FFL member—is likely to qualify as a top-ten source of traced guns.  In fact, the sheer number of "crime guns" retrieved between 2017 and 2021 suggest that it is unlikely that the two-hundred-odd respondents make up a statistically significant proportion of the FFLs who have provided gun-trace information to the ATF during that period.  *See* Dkt. 26-1 at 13 (noting that "[b]etween 2017 and 2021, 13,336 crime guns were traced and recovered in Baltimore, only 8,057 of which were traced to known purchasers").

For these reasons, the Court lacks any basis, beyond mere speculation, from which to conclude that any one of NSSF's members is likely to appear by name in ATF's response to the City's FOIA request.  Because NSSF "must specifically 'identify members who have suffered [or are likely to suffer] the requisite harm'" to establish associational standing, *Chamber of Com.*, 642 F.3d at 199 (quoting *Summers*, 555 U.S. at 499), and NSSF has failed to do so, the Court concludes that NSSF has not established that it has standing on this basis.

**2.**

NSSF argues in the alternative that all of its members have standing because all FFLs are harmed when *any* FFL is associated publicly with a gun used in a crime.  Dkt. 26-1 at 8.  In particular, NSSF argues that the "release of any information related to any crime-gun trace harms the reputational and economic interests of all FFLs—regardless of whether a particular FFL has any connection to the trace at issue—by stigmatizing FFLs generally as facilitators of illegal gun

trafficking and gun crimes." *Id.* But even if the Court were to credit NSSF's assertion that every FFL is injured when a gun used in a crime is traced to an FFL—an assertion that is implausible on its face—NSSF's argument fails for another reason: causation and redressability.

As noted above, "the 'case or controversy' limitation of Article III . . . requires that a federal court act only to redress injury that fairly can be traced to the challenged action of the defendant, and not injury that results from the independent action of some third party not before the court." *Grocery Mfrs. Ass'n v. EPA*, 693 F.3d 169, 176 (D.C. Cir. 2012) (quoting *Simon v. Eastern Ky. Welfare Rights Org.*, 426 U.S. 26, 41 (1976)). Accordingly, to satisfy the constitutional minimum to have standing, a party must show that the injuries complained of are caused by the defendant such that the Court can take action to redress those injuries. But as the City notes in its opposition to NSSF's renewed motion to intervene, NSSF argues "that industry-wide harm will result from disclosure of any trace data," but "that supposed harm could never be redressed by relief in this case because certain crime gun trace information is already regularly made public." Dkt. 31 at 21. The identities of FFLs that sell guns used in crimes, for example, are routinely disclosed in public court filings. *Id.* at 25 (listing examples of court filings in which the source FFL is disclosed as part of a criminal proceeding). News outlets also publish lists of the FFLs that are the top sources of guns used in crimes. *See, e.g.,* Nick Penzenstadler, Gun Shops that Sell the Most Guns Used in Crime Revealed in New List, USA Today (Feb. 15, 2024), https://www.usatoday.com/story/news/investigations/2024/02/15/shops-selling-most-crime-guns-revealed-atf/72581120007/. In light of the regular public disclosure of FFLs that sell guns used in crimes, it is hard to see how disclosure of any specific FFLs by the ATF in response to the City's FOIA request would harm NSSF members—writ large—in any cognizable way. *See Rtskhiladze v. Mueller*, No. 20-cv-1591, 2021 WL 3912157, at *11 (D.D.C. Sept. 1, 2021)

(finding "an independent, sufficient, unchallenged, and admittedly accurate source of those same injuries that would not be affected by any decision or relief ordered in this matter" to defeat the plaintiff's standing); *Am. Chemistry Council, Inc. v. Nat'l Acad. of Scis.*, No. 23-cv-2113, 2024 WL 1141465, at *15 (D.D.C. Mar. 15, 2024) (noting that the carcinogenic effect of formaldehyde had been commented on for years, and thus the release of the report at issue would not have a reputational effect that would be redressable by the court).

Accordingly, this theory on which NSSF seeks to establish associational standing also fails.

**B.**

Pivoting, NSSF argues that it has standing to sue on its own behalf.  To establish "organizational standing," an organization must establish that the organization itself faces a threat of "actual or threatened injury in fact that is fairly traceable to the alleged illegal action and likely to be redressed by a favorable court decision."  *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 919 (D.C. Cir. 2015) (quoting *Equal Rights Ctr. v. Post Props., Inc.*, 633 F.3d 1136, 1138 (D.C. Cir. 2011)).  It is insufficient for an organization to allege "a frustration of its purpose because frustration of an organization's objectives 'is the type of abstract concern that does not impart standing.'"  *Id.* (quoting *Nat'l Taxpayers Union, Inc. v. United States*, 68 F.3d 1428, 1433 (D.C. Cir. 1995)).  Instead, the organization must show that "the agency's action . . . injured [or will injure] the [organization's] interest" and that "the organization used [or will use] its resources to counteract that harm."  *PETA v. USDA*, 797 F.3d 1087, 1093 (D.C. Cir. 2015).

Here, NSSF argues that it "will suffer an injury in fact" if the City's FOIA request is fulfilled due to the "potential stare decisis and persuasive effects of a decision in favor of Baltimore in this case."  Dkt. 26-1 at 16.  A favorable outcome for the City, NSSF argues, will

cause it to expend increasing amounts to "respond[] to the proliferation or new requests and lawsuits" seeking FFL-level gun-trace information. *Id.* at 17. But "[t]he mere fact that an organization redirects some of its resources to litigation and legal counseling in response to actions or inactions of another party is insufficient to impart standing upon the organization." *Turlock Irr. Dist. v. FERC*, 786 F.3d 18, 24 (D.C. Cir. 2015) (quoting *Nat'l Taxpayers Union*, 68 F.3d at 1434; *see also Food & Water Watch*, 808 F.3d at 919 (D.C. Circuit "precedent makes clear that an organization's use of resources for litigation, investigation in anticipation of litigation, or advocacy is not sufficient to give rise to an Article III injury."). NSSF's attempt to demonstrate organizational standing is therefore plainly foreclosed by precedent.

## C.

NSSF's failure to demonstrate it that is has Article III standing requires the Court to deny its motion for leave to intervene as of right. *See Mil. Toxics Project v. EPA*, 146 F.3d 948, 953 (D.C. Cir. 1998). Although the law is less well settled when it comes to permissive intervention, the Court concludes that the Foundation's failure to establish that it has Article III standing provides an additional reason to deny its request for leave to intervene permissively.

As the Court noted in its prior Order, some uncertainty exists regarding whether Article III standing is required for permissive intervention in this circuit. In *In re Endangered Species Act Section 4 Deadline Litigation*, 704 F.3d 972, 980 (D.C. Cir. 2013), the D.C. Circuit observed that the question remains unresolved. Years earlier, in *EEOC v. National Children's Center, Inc.*, 146 F.3d 1042, 1045 (D.C. Cir. 1998), the D.C. Circuit at least gestured toward requiring standing for permissive intervention. In that case, the court addressed subject-matter jurisdiction and held that "[p]ermissive intervention . . . has always required an independent basis for jurisdiction," but then recognized "a narrow exception when the third party seeks to

14

intervene for the limited purpose of obtaining access to documents protected by a confidentiality order." *Id.* More recently, in *Yocha Dehe v. United States Department of the Interior*, 3 F.4th 427, 431–32 (D.C. Cir. 2021), the D.C. Circuit upheld a district court order denying a party's motion for permissive intervention on the ground that the proposed intervenor lacked standing. The question is further complicated, moreover, by cases permitting a group of interested parties to intervene, so long as at least one of the proposed intervenors was able to establish Article III standing. *See*, *e.g*., *Food & Water Watch v. FERC*, 28 F.4th 277, 284 (D.C. Cir. 2022) ("[W]hen multiple petitioners bring claims jointly, only one petitioner needs standing to raise each claim.").

Without endeavoring to answer the open question for all purposes, the Court can discern the following principles, which are dispositive here. First, a federal court may not, of course, "adjudicate a claim over which it lacks subject matter jurisdiction." *Nat'l Children's Ctr.*, 146 F.3d at 1046. Second, permissive intervention requires that the putative intervenor "have a claim or defense that shares with the main action a common question of law or fact," Fed. R. Civ. P. 24(b)(1)(B), although the D.C. Circuit has not always construed the term "claim" narrowly, *Nat'l Children's Ctr.*, 146 at 1046 (citing *Nuesse v. Camp*, 385 F.2d 694, 704 (D.C. Cir. 1967)). Third, the federal court must maintain jurisdiction throughout the litigation, *see TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021), and, thus, if the only party with standing declines to pursue a claim or defense, a third-party that lacks standing cannot step into the shoes of the principal party and continue to litigate that claim or defense, *see Diamond v. Charles*, 476 U.S. 54, 68 (1986) ("[A]n intervenor's right to continue a suit in the absence of the party on whose side intervention was permitted is contingent upon a showing by the intervenor that he fulfills the requirements of Art. III."); *Arizonans for Off. Eng. v. Arizona*, 520 U.S. 43, 65 (1997) ("An

intervenor cannot step into the shoes of the original party unless the intervenor independently fulfills the requirements of Article III." (quotation marks omitted)).

Applying those principles here, the Court declines to exercise its discretion to permit NSSF to appear permissively as a party to case. As this point, the Foundation has already—with leave of the Court—filed an amicus brief, and there is no reason to believe that it would have any argument to add if permitted to participate as a party. If the Court concludes that oral argument is warranted, moreover, it will permit NSSF to be heard. As a result, all that permissive intervention would add to NSSF's arsenal of litigation tools is the ability to appeal, should the ATF lose and decline to appeal, or to continue to litigate the Exemption 3 defense, should the agency accede to the City's objections. To take either of these steps, however NSSF would need standing, and as explained above, it has failed to clear that hurdle. *See Arizonans for Off. Eng.*, 520 U.S. at 64 ("Standing to defend on appeal in the place of an original defendant, no less than standing to sue, demands that the litigant possess 'a direct stake in the outcome.'" (quoting *Diamond*, 476 U.S. at 62)). Moreover, should the ATF withdraw its invocation of Exemption 3, nothing would remain from NSSF to litigate, since, as explained above, FOIA is a disclosure statute, and NSSF has not brought a reverse-FOIA action under the APA or any other statute. In short, under these circumstances, permissive intervention would serve no meaningful purpose—or at least no purpose that is not served equally well by permitting NSSF to participate as an amicus.

## CONCLUSION

For these reasons, it is hereby **ORDERED** that NSSF's renewed motion to intervene, Dkt. 26, is **DENIED**.

In addition, NSSF has moved for leave to file under seal the declarations from individual FFLs discussed in this order, Dkt. 25.  NSSF "seeks only to prevent the public disclosure of the FFLs' names," *id.* at 2; the substance of the FFLs' declarations will be filed on the public docket. After considering the factors in *United States v. Hubbard*, 650 F.2d 293 (D.C. Cir. 1980), the Court concludes that permitting the redaction of the FFLs' names is appropriate to protect the privacy of the FFLs and will not prejudice the parties or the public as the substance of the declarations will be publicly available.  Accordingly, the Court hereby **GRANTS** NSSF's motion for leave to file under seal.  NSSF is directed to file a redacted version of the declarations on the public docket on or before July 1, 2024.

**SO ORDERED**.

/s/ Randolph D. Moss
RANDOLPH D. MOSS
United States District Judge

Date:  June 21, 2024