## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| MAYOR AND CITY COUNCIL OF BALTIMORE,<br><br>*Plaintiff*,<br><br>v.<br><br>BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES,<br><br>*Defendant*. | Civil Action No. 23-3762 (RDM) |

## <u>MEMORANDUM OPINION AND ORDER</u>

The Mayor and City Council of Baltimore ("Baltimore") bring this Freedom of Information Act ("FOIA") action against the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF" or "Bureau"). *See* Dkt. 1. Baltimore contends that the Bureau unlawfully denied its FOIA request, which sought information contained in the ATF's Firearms Trace System database pertaining to firearms recovered in Baltimore. *Id.* at 14 (Compl. ¶¶ 55–60). Pending before the Court are the parties' cross-motions for summary judgment. *See* Dkt. 33; Dkt. 35. For the following reasons, the Court will **GRANT** the Bureau's motion for summary judgment, Dkt. 33, and will **DENY** Baltimore's cross-motion for summary judgment, Dkt. 35.

## I.  BACKGROUND

### A.    Firearms Tracing and the Firearms Trace System Database

The Bureau is a component of the U.S. Department of Justice that is, among other things, responsible for enforcing the federal firearms laws, including the Gun Control Act of 1968, 18 U.S.C. §§ 921–930 ("Gun Control Act"). Dkt. 33-1 at 2 (Wood Decl. ¶ 3). The Gun Control Act established a licensing system for persons or entities engaged in manufacturing, importing,

dealing, and collecting firearms. *Id.* The Attorney General is responsible for administering this system, 18 U.S.C. § 923, and, as relevant here, collecting information necessary to determine "the disposition of 1 or more firearms in the course of … a criminal investigation," *id.* § 923(g)(7). The Attorney General has, in turn, delegated authority to perform these functions to the Bureau. 28 C.F.R. § 0.130(a).

The Bureau's duties include firearms tracing, which involves the systematic tracking of a recovered firearm from its manufacturer or importer through its subsequent introduction into the distribution chain, in order to identify an unlicensed purchaser. Dkt. 33-1 at 2–3 (Wood Decl. ¶¶ 4–5). To carry out this function, the Bureau maintains the Firearms Trace System ("FTS") database. *Id.* at 2 (Wood Decl. ¶ 4). A firearm trace begins when the Bureau receives a tracing request from a law enforcement agency that has recovered a firearm or suspects that a firearm has been used in a crime. *Id.* at 3 (Wood Decl. ¶ 5). The Bureau also requests traces in connection with investigations that it conducts itself. *Id.*

To facilitate a trace, the requesting agency provides the Bureau with information about the firearm, including its type, manufacturer, caliber, and serial number. *Id.* (Wood Decl. ¶ 6). The Bureau then contacts the manufacturer or importer of the gun to determine when and to whom the firearm at issue was sold. *Id.* When it contacts a manufacturer or importer to request information about a firearm, the Bureau shares information about only the firearm involved in the trace, not the circumstances that led to the initiation of the trace. *Id.* The Bureau continues the tracing process to the extent the records allow and considers a trace successful when it can identify the firearm's first retail purchaser. *Id.* at 3–4 (Wood Decl. ¶ 7). The Bureau then forwards the firearm tracing results directly to the requesting law enforcement agency. *Id.* at 4 (Wood Decl. ¶ 7).

The Bureau stores information about every traced firearm ("firearms trace data") in the FTS database. *Id.* at 3 (Wood Decl. ¶ 6). The FTS database contains more than 75 tables with a combined total of 800 fields. *Id.* at 9 (Wood Decl. ¶ 23). This data can be grouped into the following six categories:

> (i) information about the law enforcement agency requesting the trace, such as the agency's name, address, case number, and investigative notes provided by the agency; (ii) information provided by the requesting agency regarding its recovery of the firearm, such as the date and location where the traced firearm was taken into custody by the requesting agency; (iii) information about purchasers of the traced firearm; (iv) information about possessors of the traced firearm and any associates (i.e., persons with the possessor of the firearm when the firearm comes into police custody), such as their names and addresses, driver's license information and social security numbers, and any related vehicle information; (v) information identifying each FFL [Federal Firearm Licensee] that has sold the traced firearm; and (vi) information about the traced firearm, such as the manufacturer, importer, model, weapon type, caliber and serial number.

*Id.* at 9–10 (Wood Decl. ¶ 23).

The Bureau uses the data stored in the FTS "database to provide the public and law enforcement agencies with insights into firearms recoveries." *Id.* at 4 (Wood Decl. ¶ 8). It creates aggregate statistical reports for internal ATF use and sometimes for external law enforcement agencies. *Id.* These reports "help domestic and international law enforcement agencies solve firearms crimes, detect firearms trafficking, and identify trends with respect to intrastate, interstate and international movement of crime guns." *Id.* The Bureau also publishes on its website "a limited number of aggregate statistical reports that ATF believes will provide helpful insights to the public without disclosing any law-enforcement or other sensitive material." *Id.*; *see* Data & Statistics: Bureau of Alcohol, Tobacco, Firearms & Explosives, available at https://www.atf.gov/resource-center/data-statistics [https://www.atf.gov/resource-center/data-statistics].

B.    **Statutory Background**

FOIA requires federal agencies to make covered records "promptly available to any person" upon request, 5 U.S.C. § 552(a)(3), unless one of nine exemptions applies, *id.* § 552(b). At issue in this case is Exemption 3, which protects records "specifically exempted from disclosure by statute," *id.* § 552(b)(3), if that statute satisfies certain criteria, *id.* § 552(b)(3)(A)– (B), which are discussed further below.

Over the last two decades, Congress has enacted a series of appropriations riders, known as the "Tiahrt Riders," that restrict the Bureau's ability to disclose firearms trace data. Congress enacted the first iteration of the Tiahrt Rider in 2003, soon after the Seventh Circuit affirmed a district court decision requiring the Bureau to disclose firearms trace data pursuant to FOIA. *See City of Chicago v. U.S. Dep't of Treasury*, 287 F.3d 628, *amended on denial of reh'g*, 287 F.3d 672 (7th Cir. 2002), *vacated*, *Dep't of Just. v. City of Chicago*, 537 U.S. 1229 (2003). By way of explanation, the House Appropriations Committee expressed "concern[] that certain law enforcement databases may be subject to public release under the Freedom of Information Act" and that the release of firearms trace data would "jeopardiz[e] criminal investigations and officer safety" and "pose a risk" to "the privacy of innocent citizens." H.R. Rep. No. 107-575 at 20 (2002).

To address these concerns, the 2003 Tiahrt Rider provided that "[n]o funds appropriated under this Act or any other Act with respect to any fiscal year shall be available to take any action based upon any provision of 5 U.S.C. 552 with respect to records collected or maintained" by the Bureau in connection with its administration of firearm tracing, "except that such records may continue to be disclosed to the extent and in the manner that records so collected, maintained, or obtained have been disclosed under 5 U.S.C. 552 prior to the date of the enactment of" the Rider. Consolidated Appropriations Resolution, 2003, Pub. L. No. 108-7, 117

Stat. 11, 473–74 (2003) ("2003 Rider").  In lay terms, subject to the exception, the 2003 Rider prevented the Bureau from using appropriated funds to respond to FOIA requests for firearms trace data.  In 2004, Congress removed the Rider's express reference to FOIA and replaced it with language barring the use of appropriated funds "to disclose to the public the contents" of the FTS database.  Consolidated Appropriations Act, 2004, Pub. L. No. 108-199, 118 Stat. 3, 53 (2004) ("2004 Rider").  The 2004 Rider also limited the exception to requests "for information made by any person or entity" on or before January 1, 1998.  *Id.*

Shortly after the passage of the 2004 Tiahrt Rider, the Seventh Circuit held that the 2003 and 2004 Riders had not altered the public's right to access firearms trace data under FOIA.  *City of Chicago v. U.S. Dep't of Treasury*, 384 F.3d 429 (7th Cir. 2004).  The court concluded that both provisions "merely create[d] a procedural hurdle to disclosure" of firearms trace data, which could be overcome by a court-appointed special master, paid for by Chicago.  *Id.* at 436.  Under that theory, the ATF does not voluntarily release records using appropriated funds when a court orders the release, and the requester covers the expense.

The following year, Congress enacted yet another iteration of the Tiahrt Rider. Consolidated Appropriations Act, 2005, Pub. L. No. 108-447, 118 Stat. 2809, 2859–60 (2004) ("2005 Rider").  This time, in addition to prohibiting the Bureau from using appropriated funds to disclose firearms trace data, the Rider provided that "all such data shall be immune from legal process."  *Id.*  After the passage of the 2005 Rider, the Seventh Circuit vacated its prior decision and held that the Rider qualified as an Exemption 3 statute.  *City of Chicago v. U.S. Dep't of Treasury*, 423 F.3d 777, 782 (7th Cir. 2005) ("*City of Chicago III*").  The court concluded that "Congress' clear intention in adding the 'immune from legal process' language was to cut off access to" firearms trace data.  *Id.* at 781.

Congress included similar Tiahrt Riders in appropriations statutes enacted in 2006, 2008, and 2009. *See* Science, State, Justice, Commerce, and Related Agencies Appropriations Act, 2006, Pub. L. No. 109-108, 119 Stat. 2290, 2295–96 (2006) ("2006 Rider"); Consolidated Appropriations Act, 2008, Pub. L. No. 110-161, 121 Stat. 1844, 1903–04 (2007) ("2008 Rider"); Omnibus Appropriations Act, 2009, Pub. L. No. 111-8, 123 Stat. 524, 575–76 (2009) ("2009 Rider"). Each iteration prohibited the Bureau from using funds appropriated during the relevant fiscal year and every year thereafter to disclose firearms trace data, and each made "all such data . . . immune from legal process." Consistent with the Seventh Circuit's decision in *City of Chicago III*, lower courts "interpreted the Tiahrt Riders to prohibit the disclosure of FTS data pursuant to a FOIA request." *Everytown for Gun Safety Support Fund v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 984 F.3d 30, 36 (2d Cir. 2020) (collecting cases); *see also Skinner v. U.S. Dep't of Justice*, 744 F Supp. 2d 185, 204 (D.D.C. 2010) (same).

Then, on October 28, 2009, Congress enacted the OPEN FOIA Act of 2009. Department of Homeland Security Appropriations Act, Pub. L. No. 111-83, § 564, 123 Stat. 2142, 2184 (2009) (codified at 5 U.S.C. § 552(b)(3)(B)). The OPEN FOIA Act amended Exemption 3 to provide that covered withholding statutes enacted after October 28, 2009, must "specifically cite[]" to section 552(b)(3). 5 U.S.C. § 552(b)(3)(B) ("This section does not apply to matters that are . . . specifically exempted from disclosure by statute (other than section 552b of this title), if that statute . . . if enacted after the date of enactment of the OPEN FOIA Act of 2009, specifically cites to this paragraph."). Thus, following enactment of the OPEN FOIA Act, withholding statutes enacted after October 28, 2009, satisfy Exemption 3 only if they (1) require withholding and leave no discretion to the agency or establish particular criteria for withholding, and (2) specifically cite to Exemption 3.

Two months after it adopted the OPEN FOIA Act, Congress included yet another

iteration of the Tiahrt Rider in the Consolidated Appropriations Act of 2010, Pub. L. No. 111-

117, 123 Stat. 3034, 3128–29 (2009) ("2010 Rider").  The 2010 Rider used the same anti-

disclosure language used in the 2009 Rider, and it also included two additional restrictions on the

disclosure of firearms trace data.  It did not, however, include a specific citation to 5 U.S.C.

§ 552(b)(3), as required by the OPEN FOIA Act.

Finally, Congress enacted the currently operative Tiahrt Rider in 2012.  Consolidated and

Further Continuing Appropriations Act, 2012, Pub. L. No. 112-55, 125 Stat. 552, 609–10 (2011)

(codified at 18 U.S.C. § 923 note) ("2012 Rider").  The 2012 Rider is identical to the 2010 Rider

in all material respects.  It provides:

> [D]uring the current fiscal year and in each fiscal year thereafter, no funds
> appropriated under this or any other Act may be used to disclose part or all of
> the contents of the Firearms Trace System database maintained by the National
> Trace Center of the Bureau of Alcohol, Tobacco, Firearms and Explosives or
> any information required to be kept by licensees pursuant to section 923(g) of
> title 18, United States Code, or required to be reported pursuant to paragraphs
> (3) and (7) of such section, except to: (1) a Federal, State, local, or tribal law
> enforcement agency, or a Federal, State, or local prosecutor; or (2) a foreign law
> enforcement agency solely in connection with or for use in a criminal
> investigation or prosecution; or (3) a Federal agency for a national security or
> intelligence purpose; unless such disclosure of such data to any of the entities
> described in (1), (2) or (3) of this proviso would compromise the identity of any
> undercover law enforcement officer or confidential informant, or interfere with
> any case under investigation; and no person or entity described in (1), (2) or (3)
> shall knowingly and publicly disclose such data; and all such data shall be
> immune from legal process, shall not be subject to subpoena or other discovery,
> shall be inadmissible in evidence, and shall not be used, relied on, or disclosed
> in any manner, nor shall testimony or other evidence be permitted based on the
> data, in a civil action in any State (including the District of Columbia) or Federal
> court or in an administrative proceeding other than a proceeding commenced by
> the Bureau of Alcohol, Tobacco, Firearms and Explosives to enforce the
> provisions of chapter 44 of such title, or a review of such an action or
> proceeding; except that this proviso shall not be construed to prevent: (A) the
> disclosure of statistical information concerning total production, importation,
> and exportation by each licensed importer (as defined in section 921(a)(9) of
> such title) and licensed manufacturer (as defined in section 921(a)(10) of such

title); (B) the sharing or exchange of such information among and between Federal, State, local, or foreign law enforcement agencies, Federal, State, or local prosecutors, and Federal national security, intelligence, or counterterrorism officials; or (C) the publication of annual statistical reports on products regulated by the Bureau of Alcohol, Tobacco, Firearms and Explosives, including total production, importation, and exportation by each licensed importer (as so defined) and licensed manufacturer (as so defined), or statistical aggregate data regarding firearms traffickers and trafficking channels, or firearms misuse, felons, and trafficking investigations[.]

18 U.S.C. § 923 note.  Like the 2010 Rider, it does not contain a specific citation to section 552(b)(3).  Despite that omission, the Second Circuit has held that the 2012 Rider satisfies Exemption 3 and therefore "prohibits the ATF from disclosing" firearms trace data in response to a FOIA request.  *Everytown for Gun Safety*, 984 F.3d at 43–44.

## C.    Baltimore's FOIA Request

In recent years, Baltimore has launched several initiatives designed to prevent gun violence.  Dkt. 35-5 at 6 (Pl.'s SUMF ¶ 1).  To facilitate those efforts, Baltimore submitted a FOIA request to the ATF on September 12, 2023, seeking information about firearms recovered from crimes throughout the city.  Dkt. 33-6 at 3 (Def.'s SUMF ¶ 16); Dkt. 35-5 at 4 (Pl.'s SUMF ¶ 16); Dkt. 1-1.  The request consisted of four parts: (1) records "sufficient to identify the federally licensed firearms dealers . . . that are the top ten sources of firearms recovered in Baltimore from 2018 through 2022," along with specific information about those firearms, on "either an aggregate or individualized basis;" (2) information about firearms recovered in Baltimore between 2018 and 2022 "in connection with the category of offense or other circumstance of Homicide, Homicide - Attempted, Aggravated Assault, Robbery, Suicide, and Suicide - Attempted," on "either an aggregate or individualized basis;" (3) "any tables or spreadsheets used to compile the 'Top Source Cities' table" in ATF's 2023 report on Baltimore

crime guns;[1] and (4) "any tables or spreadsheets used to compile the 'Top Recovery Cities' table" in the 2023 report.  Dkt. 33-6 at 3–4 (Def.'s SUMF ¶ 17); Dkt. 35-5 at 4–5 (Pl.'s SUMF ¶ 17); Dkt. 1-1 at 2–3.

The ATF denied Baltimore's FOIA request.  Dkt. 33-6 at 4–5 (Def.'s SUMF ¶ 18–19); Dkt. 35-5 at 5 (Pl.'s SUMF ¶ 18–19); Dkt. 1-2.  As the Bureau explained in its final response letter, the data that Baltimore was seeking from the Firearms Trace System database was "exempt from disclosure pursuant to Exemption 3 of the FOIA and [the 2012 Tiahrt Rider,] Public Law 112-55, 125 Stat. 552."  Dkt. 1-2 at 2.  In particular, the Bureau pointed to "[t]he most recent iteration" of the Tiahrt Rider, which, like earlier iterations, precludes the ATF from releasing trace data, except "to a law enforcement agency or a prosecutor solely in connection with a criminal investigation or prosecution."  *Id.*

Baltimore filed an administrative appeal with the Department of Justice's Office of Information Policy ("OIP").  Dkt. 33-6 at 5 (Def.'s SUMF ¶ 20); Dkt. 35-5 at 5 (Pl.'s SUMF ¶ 20); Dkt. 1-3 at 2.  In that appeal, Baltimore argued that "the information sought . . . is not exempt from disclosure because the claimed statutory exemption from disclosure, Public Law 112-55, 125 Stat. 552, known as the 'Tiahrt Rider,' is not a basis for withholding information under FOIA."  Dkt. 1-3 at 3.  It further argued that "even if the Tiahrt Rider were a basis for withholding information under FOIA, the Tiahrt Rider does not bar the production of the requested information in the form of 'statistical aggregate data.'"  *Id.*  Baltimore also represented that "to the extent that ATF's denial of Baltimore's request is based on the Tiahrt Rider's restrictions on expending funds, Baltimore has requested a fee waiver, and in the alternative is

---

[1] *See* ATF, National Firearms Commerce and Trafficking Assessment (NFCTA): Crime Guns - Volume Two, Baltimore, MD Report (2023), https://www.atf.gov/firearms/docs/report/ baltimore-md-state-report-large-cities/download [https://perma.cc/BVV4-5Q49].

willing to pay the costs of a production." Dkt. 35-5 at 8 (Pl.'s SUMF ¶ 12); Dkt. 33-4 at 3–4.

"Accordingly," it asserted, "no appropriated funds are needed to fulfill Baltimore's request."

Dkt. 35-5 at 8 (Pl.'s SUMF ¶ 12); Dkt. 33-4 at 4.

**D.    Procedural Background**

On December 18, 2023, Baltimore filed this suit requesting that the Court order the

Bureau to release the requested records. *See* Dkt. 1 at 14–15 (Compl. ¶¶ 55–60); Dkt. 33-6 at 5

(Def.'s SUMF ¶ 21); Dkt. 35-5 at 5 (Pl.'s SUMF ¶ 21). Baltimore asserts that the requested

records "are critical tools" in its efforts "to address gun violence." Dkt. 33-2 at 4. Although

Baltimore has data about "who is likely to be a victim, or an aggressor," it lacks information

about "where a gun is likely to come from, or how distant the gun's use is from its origins." Dkt.

35-3 at 3 (Mavronis Decl. ¶ 8). Baltimore explains that it hopes to use data about the origins of

crime guns to tailor its violence-intervention efforts. *Id.* at 3–4 (Mavronis Decl. ¶ 8). It also

hopes to make this data "available to the public" through its Public Accountability Dashboard

and published reports on its public safety strategy. *Id.* at 3 (Mavronis Decl. ¶ 10).

Pending before the Court are the Bureau's motion for summary judgment, Dkt. 33, and

Baltimore's cross-motion for summary judgment, Dkt. 35. In its summary judgment materials,

Baltimore reiterates that it "has both the means and the willingness to pay any reasonable costs

associated with ATF's fulfillment of [its] FOIA Request." Dkt. 35-5 at 7 (Pl.'s SUMF ¶ 11);

Dkt. 35-4 at 2 (Thompson Decl. ¶ 7).

## II.  LEGAL STANDARD

"FOIA cases typically and appropriately are decided on motions for summary judgment."

*Nat'l Sec. Counselors v. CIA*, 960 F. Supp. 2d 101, 133 (D.D.C. 2013) (internal quotation marks

omitted) (quoting *Georgacarakos v. FBI*, 908 F. Supp. 2d 176, 180 (D.D.C. 2012)). A court may

grant summary judgment if there is no "genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56.

FOIA requires federal agencies to make certain records "promptly available to any person" upon request, 5 U.S.C. § 552(a)(3), unless one of nine exemptions applies, § 552(b). These exemptions "are explicitly made exclusive" and "must be narrowly construed." *Elec. Priv. Info. Ctr. v. U.S. Dep't of Homeland Sec.*, 777 F.3d 518, 522 (D.C. Cir. 2015) (quoting *Milner v. Dept. of Navy*, 562 U.S. 562, 565 (2011)).  Thus, when an agency withholds requested documents, it bears the burden of justifying its decision by establishing that an exemption applies.  *Id.*; *see Nat'l Sec. Counselors*, 960 F. Supp. 2d at 132 ("When an agency's response to a FOIA request is to withhold responsive records, either in whole or in part, the agency 'bears the burden of proving the applicability of claimed exemptions.'" (quoting *ACLU v. U.S. Dep't of Def.*, 628 F.3d 612, 619 (D.C. Cir. 2011))).

An agency may meet this burden by proffering affidavits or declarations, along with a *Vaughn* index when necessary.  *Nat'l Sec. Counselors*, 960 F. Supp. 2d at 133.  "If an agency's affidavit describes the justifications for withholding the information with specific detail, demonstrates that the information withheld logically falls within the claimed exemption," and "is not contradicted by contrary evidence in the record or by evidence of the agency's bad faith, then summary judgment is warranted on the basis of the affidavit alone."  *ACLU*, 628 F.3d at 619.  In reviewing an agency's decision to withhold records, however, a court determines *de novo* whether the withholding was proper and has jurisdiction, when appropriate, "to enjoin the agency from withholding agency records and to order the production of any agency records improperly withheld from the complainant." 5 U.S.C. § 552(a)(4)(B).

## III.  ANALYSIS

### A.     The Rider Is an Exemption 3 Statute

The Bureau invokes FOIA Exemption 3 to justify its decision to withhold the firearms trace data that Baltimore seeks.  Dkt. 33 at 21; Dkt. 33-3 at 2–3.  It asserts that the 2012 Tiahrt Rider "plainly prohibits disclosure of 'part or all of the contents of the Firearms Trace System database'" and therefore qualifies as an Exemption 3 withholding statute.  Dkt. 33 at 21 (quoting 18 U.S.C. § 923 note); Dkt. 33-1 at 8 (Wood Decl. ¶¶ 18–20).

Exemption 3 provides that an agency may withhold information "specifically exempted from disclosure by statute" if that statute "(i) requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue" or "(ii) establishes particular criteria for withholding or refers to particular types of matters to be withheld."  5 U.S.C. § 552(b)(3)(A).  "These conditions are disjunctive; a statute need satisfy only one of them to qualify under Exemption 3."  *Gov't Accountability Project v. Food & Drug Admin.*, 206 F. Supp. 3d 420, 428 (D.D.C. 2016) (citing *Pub. Citizen, Inc. v. Rubber Mfrs. Ass'n*, 533 F.3d 810, 813 (D.C. Cir. 2008)).  Because the 2012 Tiahrt Rider was enacted after October 28, 2009, it is also subject to the OPEN FOIA Act's requirement that the exempting statute "specifically cite[] to" Exemption 3.  5 U.S.C. § 552(b)(3)(B).

To determine whether the Bureau has properly invoked Exemption 3, the Court must resolve two questions.  First, does the 2012 Tiahrt Rider "meet Exemption 3's requirements?" *Labow v. U.S. Dep't of Just.*, 831 F.3d 523, 527 (D.C. Cir. 2016).  Second, "does the information that was withheld fall within that statute's coverage?"  *Id.* (citation modified).  For the reasons explained below, the Court concludes that the Bureau properly withheld the records at issue: The 2012 Tiahrt Rider is an Exemption 3 withholding statute, and the firearms trace data that Baltimore seeks falls within the Rider's prohibition on disclosure.

1.    *The Rider Specifically Exempts Firearms Trace Data from Disclosure.*

The Court must first determine whether the 2012 Tiahrt Rider "satisfies the threshold requirement that it *specifically exempt* matters from disclosure." *Pub. Citizen*, 533 F.3d at 814 (emphasis in original) (citation modified).  To satisfy this threshold requirement, "a statute must *on its face* exempt matters from disclosure." *Nat'l Ass'n of Home Builders v. Norton*, 309 F.3d 26, 38 (D.C. Cir. 2002) (emphasis in original).  The D.C. Circuit has emphasized that "legislative history will not avail if the language of the statute itself does not explicitly deal with public disclosure." *Id.* (citation modified).  "[O]nly explicit nondisclosure statutes that evidence a congressional determination that certain materials ought to be kept in confidence will be sufficient to qualify under the exemption." *Wis. Project on Nuclear Arms Control v. U.S. Dep't of Com.*, 317 F.3d 275, 280 (D.C. Cir. 2003).

As the Second and Seventh Circuits have concluded, the Tiahrt Rider plainly embodies a congressional determination that the AFT's firearms trace data ought to be kept from the public. *See Everytown for Gun Safety*, 984 F.3d at 39–40 (2d Cir. 2020) (interpreting the 2012 Rider); *City of Chicago III*, 423 F.3d at 781–82 (interpreting the 2005 Rider).  As relevant here, that determination is most clearly set forth in the Rider's bar on the use of appropriated funds to disclose firearms trace data.  Unlike statutes that the D.C. Circuit has declined to treat as Exemption 3 withholding statutes, the Rider explicitly addresses public disclosure of the records at issue.  *Cf., e.g.*, *Norton*, 309 F.3d at 37 (explaining that the Endangered Species Act is not an Exemption 3 statutes because "nothing in the [Act] refers to withholding information" or "to nondisclosure of information").  It prohibits the Bureau from using appropriated funds to "*disclose* part or all of the contents of the Firearms Trace System database," except disclosures to governmental agencies for law enforcement, national security, or intelligence purposes.  18 U.S.C. § 923 note (emphasis added).  The effect of that funding restriction is to prohibit the

Bureau—that is, "the federal agency that collects the data"—"from acting on a request for disclosure" made by a member of the public. *City of Chicago III*, 423 F.3d at 780; *cf. Corley v. Dep't of Just.*, 998 F.3d 981, 985 (D.C. Cir. 2021) (holding that the Child Victims' Act "unambiguously qualifies as an Exemption 3 statute" based on its "two-part requirement, that documents 'shall' be kept 'in a secure place' and *disclosed 'only' to authorized personnel (as opposed to the general public)*" (emphasis added)).

In response, Baltimore maintains that the Rider's "restriction on the use of appropriated funds" is "not a requirement that certain documents or information be withheld from public disclosure." Dkt. 35-1 at 21. It relies on the "very strong presumption" that appropriations acts do not "substantively change existing law." *Calloway v. District of Columbia*, 216 F.3d 1, 9 (D.C. Cir. 2000). It is far from clear, however, that the Tiahrt Rider needed to "substantively change existing law," at least in the sense that the presumption usually applies, to qualify as an Exemption 3 statute. FOIA Exemption 3 permits an agency to withhold records that are "specifically exempted from disclosure by statute," 5 U.S.C. § 552(b)(3), and, as the Second and Seventh Circuits have held, the Rider, as properly construed, specifically exempts firearms trace data from public disclosure. But even assuming that the presumption applies, it is rebuttable, *Robertson v. Seattle Audubon Soc'y*, 503 U.S. 429, 440 (1992), and the 2012 Rider carries the hallmarks of an appropriations act that does, in fact, change substantive law.

The Second Circuit confronted a similar appropriations restriction in *McHugh v. Rubin*, and the court concluded in that case that the appropriations provision altered the Bureau's substantive obligations. 220 F.3d 53, 57–58 (2d Cir. 2000). There, Congress had enacted a series of appropriations statutes making appropriations unavailable "to investigate or [to] act upon applications for relief from Federal firearms disabilities" under 18 U.S.C. § 925(c). *Id.* at

14

57.  In the Second Circuit's view, "Congress could not have stated more clearly that the ATF is prohibited from acting on applications submitted by individuals pursuant to § 925(c)." *Id.* at 58. The court focused on the practical effect of the appropriations restriction.  It recognized that processing applications would always "involve the use of appropriated funds." *Id.* at 57. Because the Bureau did not "have access to any funds other than those affected by the relevant spending limitation," the appropriations statutes had the "obvious" effect of suspending the Bureau's ability and duty to act on applications for relief from firearm restrictions. *Id.* at 58 ("Since the *ATF owes the plaintiff no duty* under § 925(c), the plaintiff is not entitled to a writ of mandamus compelling the ATF to act on his application." (emphasis added)).

Like the Bureau's resolution of applications for the restoration of federal firearms privileges, any release of firearms trace data pursuant to FOIA would necessarily require the use of appropriated funds.  And as in *McHugh*, the Bureau lacks "access to any funds other than those affected by the relevant spending limitation." *Id.*  Notably, the Rider provides that "no funds appropriated under [the Consolidated and Further Continuing Appropriations Act, 2012] *or any other Act* may be used to disclose" firearms trace data.  18 U.S.C. § 923 note (emphasis added).  So, Congress did not merely eliminate one potential source of funding for acting on FOIA requests seeking firearms trace data.  It made appropriated funds wholly unavailable to disclose firearms trace data. *See Maine Cmty. Health Options v. United States*, 590 U.S. 296, 318 (2020) (recognizing that language "foreclose[ing] funds from any other Act" is an indication that an appropriations statute impliedly repeals a pre-existing statutory obligation to pay).  In effect, then, the Bureau "is under a statutory duty *not* to do the act in question"—producing firearms trace data pursuant to FOIA. *McHugh*, 220 F.3d at 57 (emphasis in original).

Indeed, the Rider goes a step further than the appropriations restriction at issue in *McHugh*, because it uses words of futurity. The funding restriction applies "during the current fiscal year *and every fiscal year thereafter.*" 18 U.S.C. § 923 note (emphasis added). "[C]ourts have recognized that when Congress intends a provision in an appropriations bill to have permanent effect, it uses words of permanency or futurity (such as 'to apply in all years hereafter')." *Bldg. & Const. Trades Dep't v. Martin*, 961 F.2d 269, 274 (D.C. Cir. 1992). Likewise, the Government Accountability Office ("GAO") views words of futurity as the "crucial" signal that Congress intends an appropriations act to function as permanent legislation. *See* GAO, *Principles of Federal Appropriations Law* ("Red Book"), GAO-16-464SP, at 2-86–89 (4th ed. 2016) (citing the 2006 Rider as an example of permanent legislation "because the forward-looking effect of the phrase 'this or any other Act' coupled with the phrase 'with respect to any fiscal year' indicates Congress's intention that the provision be permanent"), https://www.gao.gov/legal/appropriations-law/red-book. The Rider's status as permanent legislation supports the conclusion that Congress intended substantively to bar the Bureau from disclosing its firearms trace data.

In sum, then, the Rider's restriction on the use of any appropriated funds—from any source, now or in the future—constitutes an explicit expression of Congress's intent to bar public disclosure of firearms trace data. To hold otherwise would elevate the kind of "formalistic logic" that the D.C. Circuit has rejected in its Exemption 3 precedents. *Wis. Project*, 317 F.3d at 281; *cf. Labow*, 831 F.3d at 527–28 (holding that the Pen Register Act is an Exemption 3 statute because "it requires the sealing of '[a]n order authorizing or approving the installation and use of a pen register or a trap and trace device'" (quoting 18 U.S.C. § 3123(d))). The "touchstone of the Exemption 3 inquiry is whether the statute is the product of congressional appreciation of the

dangers inherent in airing particular data." *Wis. Project*, 317 F.3d at 281 (citation modified).

The Rider's funding restriction—which specifically targets "disclosure," eliminates any source

of funding for public disclosure of firearms trace data, and it applies "during the current fiscal

year and in each fiscal year thereafter"—provides a clear expression of Congress's judgment that

the ATF should not publicly disclose firearms trace data. 18 U.S.C. § 923 note.

Baltimore remains unconvinced. It argues that even if the Rider precludes the use of

appropriated funds for purposes of responding to a FOIA request for firearms trace data, it does

not bar the Bureau from authorizing the release of the records if someone else foots the bill.

That matters, according to Baltimore, because FOIA employs a user-fee system, and "Baltimore

has offered to pay all costs associated with its FOIA Request." Dkt. 35-1 at 22. That argument

fails for several reasons.

To start, even when a government service or activity is funded using user fees, that mode

of funding does not obviate the need for an appropriation. As explained in the GAO's Red

Book:

> [A]ny time the Congress specifies the manner in which a Federal entity shall be
> funded and makes such funds available for obligation and expenditure, that
> constitutes an appropriation, whether the language is found in an appropriation
> act or in other legislation." 26 B-193573, Dec. 19, 1979. Some agency
> activities, such as those arising from permanent provisions permitting the
> obligation and expenditure of amounts collected from user fees, are not financed
> by annual appropriations because Congress need not enact annual legislation
> authorizing the obligations and expenditures. Nonetheless, such activities are
> financed by appropriations and, absent any statute stating otherwise, such
> activities are subject to the limitations imposed by law upon the use of all
> appropriated amounts.

Red Book at 2-22 (4th ed. 2016); *see also Nevada v. Dep't of Energy*, 400 F.3d 9, 13 (D.C. Cir.

2015) (citing the Red Book and characterizing a fund comprised of fees paid by nuclear waste

generators as a "continuing or permanent appropriation[]"); *Am. Fed'n of Gov't Emps. Loc. 1647*

*v. Fed. Lab. Rels. Auth.*, 388 F.3d 405, 409 (3d Cir. 2004) ("By law, public money includes money from any source such as taxes, customs and user fees, and other proceeds of government agency activities." (citing 31 U.S.C. § 3302)).

This principle applies with particular force in the present context, moreover, because FOIA fees are deposited as miscellaneous receipts into the general fund of the Treasury. *See* Red Book at 6-181 (3d ed. 2006) ("Fees collected by an agency under FOIA must be deposited as miscellaneous receipts."); *see also* Dep't of Just., Guide to the Freedom of Information Act: Fees and Fee Waivers at 21 n. 107 (2025), https://www.justice.gov/oip/page/file/1206606/dl?inline [https://perma.cc/5A84-32CH]; Uniform Freedom of Information Act Fee Schedule and Guidelines ("OMB Fee Guidelines"), 52 Fed. Reg. 10,012, 10,012, 10,017 (Mar. 27, 1987). In the words of the Office of Management and Budget, "funds agencies receive for providing FOIA services are to be deposited in the general revenues of the United States rather than individual agency accounts." OMB Fee Guidelines, 52 Fed. Reg. at 10,012. Nor is this simply a matter of agency discretion. To the contrary, the Miscellaneous Receipts Act directs that, except under circumstances not relevant here, "an official or agent of the Government receiving money for the Government from any source shall deposit the money in the Treasury as soon as practicable without deduction for any charge or claim." 31 U.S.C. § 3302(b). And, consistent with this requirement, the governing Department of Justice regulations provide that FOIA "[r]equesters must pay fees by check or money order made payable to the Treasury of the United States." 28 C.F.R. § 16.10(a) (2025).

Once deposited in the Treasury as miscellaneous receipts, these funds are not available to agencies for their discretionary use. *See* GAO, GAO/GGD-93-47R, FDA's FOIA Fees 1 (1993) (explaining that in general, "collected fees [under FOIA] must be deposited in the U.S. Treasury

and are not available for discretionary use by the collecting agency"),

https://www.gao.gov/assets/ggd-93-47r.pdf [https://perma.cc/6MPB-Q7JS]; OMB Fee

Guidelines, 52 Fed. Reg. at 10,017 (requiring agencies to "[r]eturn revenue to the Treasury for

defraying, wholly or in part, appropriated funds used to pay the cost of disseminating

government information").  It follows that, even if Baltimore were to pay the fees contemplated

under FOIA, the Bureau would still need to rely on an appropriation to take any action required

to process the City's FOIA request.

Baltimore's reliance on the Ninth Circuit's decision in *Cal-Almond, Inc. v. U.S. Dep't of

Agric.*, 960 F.2d 105 (9th Cir. 1992), which addressed whether a different appropriations

restriction barred disclosure under FOIA, is also unavailing.  In *Cal-Almond*, the relevant

appropriations act provided that "[n]one of the funds provided in this Act may be expended to

release information acquired from any handler under the Agricultural Marketing Agreement Act

of 1937."  *Id.* at 107 (quoting Pub. L. No. 100-460 § 630, 102 Stat. 2229, 2262 (1988)).  To

circumvent this restriction, Cal-Almond submitted an affidavit indicating that it "was willing to

pay for copying the list of almond growers and was even willing to supply its own copy machine

and generator if necessary."  *Id.* at 108.  The agency responded that releasing the requested

information "would require the expenditure of funds even if Cal-Almond supplied its own copy

machine because a USDA employee would have to spend time directing Cal-Almond to the list."

*Id.*  The Ninth Circuit rejected that argument on the ground that Congress did not intend

disclosure to "turn on the nominal expenditure of government resources."  *Id.*  Because the

agency had not shown "that government funds would be expended in releasing" the requested

information, the court concluded that the withheld information did not "fall within the terms" of

the appropriations limitation.  *Id.*

The Ninth Circuit's decision in *Cal-Almond* does not support disclosure in this case. First, the agency in *Cal-Almond* failed to submit an affidavit showing that processing the plaintiff's FOIA request would require more than "the nominal expenditure of government resources." *Id.* Based on the agency's representations, the Ninth Circuit concluded that the plaintiff's FOIA request would require only that "a government employee pause[] and give[] directions to Cal-Almond with its copy machine in tow." *Id.* Here, in contrast, the Bureau has submitted a declaration prepared from Elizabeth Wood, the Acting Chief of ATF's Information and Privacy Governance Division, who is "responsible for all records requests made of ATF under the Freedom of Information Act." Dkt. 33-1 at 1 (Wood Decl. ¶ 1). Wood estimates that Parts 1 and 2 of Baltimore's FOIA request would "take at least 240 hours of dedicated analyst and supervisory review time." Dkt. 33-1 at 11 (Wood Decl. ¶ 26). That is a far cry from the nominal expenditure of agency resources at issue in *Cal-Almond*, and, as explained above, even if Baltimore pays a FOIA processing fee, the Bureau cannot accomplish the necessary work without drawing on an appropriation.

Moreover, even if responding to Baltimore's FOIA request would require only a nominal expenditure of appropriated funds, any release of firearms trace data would still flout congressional intent. In *Cal-Almond*, the Ninth Circuit suggested that the appropriations restriction at issue there lacked sufficient clarity to qualify as a withholding statute. *See* 960 F.2d at 108 ("if Congress intended to prohibit the release of the list under FOIA—as opposed to the expenditure of funds in releasing the list—it could easily have said so"). Here, however, both the evolution of the Rider through multiple iterations, and the detail contained in the Rider, leave little doubt that Congress intended to preclude the Bureau from releasing firearms trace data to the public.

That congressional purpose is evident in another portion of the Rider that also bears on the current dispute. In addition to restricting the use of appropriated funds to disclose "part or all of the contents of the Firearms Trace System database," the Rider provides that

> all such data shall be immune from legal process, shall not be subject to subpoena or other discovery, and shall be inadmissible in evidence, and shall not be used, relied on, or disclosed in any manner, nor shall testimony or other evidence be permitted based on the data, in a civil action in any State . . . or Federal court or in an administrative proceeding other than a proceeding commenced by the Bureau . . . to enforce the provisions of chapter 44 [of Title 18] or a review of such an action or proceeding[.]

18 U.S.C. § 923 note. Standing alone, this expansive language confirms that Congress was not simply concerned with ensuring that federal funds are preserved and used only for their intended purposes. Rather, it was focused on protecting firearms trace data from public disclosure, except under narrowly defined circumstances. In this manner, the ATF's firearms trace data is "doubly restricted" from public disclosure. *City of Chicago III*, 423 F.3d at 780. The appropriations restriction (as confirmed by the above language) precludes the Bureau from releasing the data to the public, and the immunity from legal process clause precludes this Court—in any event— from granting the relief that Baltimore seeks in this case. By doing so, the provision effectively displaces FOIA's judicial remedy, 5 U.S.C. § 552(a)(4)(B).

Baltimore responds that this second restriction is a narrow one; on the City's reading, the language providing "all such data shall be immune from legal process" is best construed to "refer[] only to information disclosed to law enforcement personnel under one of the Rider's three law-enforcement exceptions." Dkt. 35-1 at 23. That reading finds support, according to Baltimore, in the preceding clauses of the Rider, which use the phrase "such data" twice—first to preclude disclosure of "such data" to federal, state, or local law enforcement or national security agencies, when disclosure "would compromise the identity of any undercover law enforcement

officer or confidential informant" or when disclosure would "interfere with any case under investigation," and, second, to preclude agencies that receive firearms trace data from the Bureau from "knowingly and publicly dislcos[ing] such data."  18 U.S.C. § 923 note.  In both these clauses, the phrase "such data" refers to data that is—or is not—disclosed to federal, state, or local law enforcement or national security agencies by the ATF.  In support of this narrow reading, Baltimore relies on *City of New York v. Beretta U.S.A. Corp.*, which concluded that "such data" "can refer to only the data to be disclosed to law enforcement recipients." 429 F. Supp. 2d 517, 526 (E.D.N.Y. 2006).

The Court is unpersuaded and agrees with the Second Circuit that the Rider is best read to immunize from legal process all firearms trace data, not only data disclosed to governmental entities for law enforcement, national security, or intelligence purposes.  *Everytown for Gun Safety*, 984 F.3d at 40 n. 5; *see also City of Chicago III*, 423 F.3d at 780–81 (construing the 2005 Rider to immunize all firearms trace data from legal process).  *Beretta* reasoned that "such data" "can only refer to the data to be disclosed to law enforcement recipients, since only that data has a connection to federal expenditures."  *Beretta*, 429 F. Supp. 2d at 526.  But because the Rider goes beyond ensuring the appropriate use of federal funds to changing substantive FOIA law, *City of Chicago III*, 423 F.3d at 781, statutory context does not support a construction of "such data" that narrows its scope to data with "a connection to federal expenditures," *Beretta*, 429 F. Supp. 2d at 526.  In any event, the Bureau's collection of firearms trace data and management of the FTS database is funded entirely by congressional appropriations and therefore connected to federal expenditures, so *Beretta*'s narrowing construction of the legal process clause is strained on its own terms.

In any event, the 2012 Rider's grammatical structure does not support Baltimore's narrow reading of the legal process clause.  According to Baltimore, each of the Rider's three uses of "such data" "must refer to the specific data actually released through 'such disclosure' under one of the three law enforcement exceptions."  Dkt. 35-1 at 24.  It cites *Beretta* for the proposition that its interpretation of the Rider is preferable because it "allows proper parallelism within the rider's various clauses."  *Id.* at 25.  But the 2012 Rider has a different grammatical structure than the 2006 Rider at issue in *Beretta*, and, under the operative version of the Rider, the first use of "such data" refers more broadly to data that cannot be released at all.  The relevant language prohibits the Bureau from disclosing firearms trace data even to governmental entities with a law enforcement, national security, or intelligence need for the information where "disclosure of *such data* . . . would compromise the identity of any undercover law enforcement officer or confidential informant, or interfere with any case under investigation."  18 U.S.C. § 923 note (emphasis added).  Because this language places a restriction on the entirety of the FTS Database, "such data" refers to "the contents of the Firearms Trace System database."  *Id.* Baltimore's construction of the legal process clause therefore fails to give "such data" a consistent meaning throughout the 2012 Rider.

 If more clarity were necessary, the "such data" in the legal process clause is also preceded by "all," a broad term that confirms that the clause is best read to protect the entirety of "the contents of the . . . database" and not a subset of that data.  *See United States v. Serafini*, 826 F.3d 146, 150 (4th Cir. 2016) ("[T]he use of the word 'all' [as a modifier] suggests an expansive meaning because 'all' is a term of great breadth." (alteration in original) (citation modified)); *see also Teles AG v. Kappos*, 846 F. Supp. 2d 102, 112 (D.D.C. 2012) ("The word 'any' is generally used in the sense of 'all' or 'every' and its meaning is most comprehensive." (citation

modified)).  And unlike the previous two clauses, the legal process clause does not include any cross-reference to subparts (1), (2) or (3) of the Rider (which identify covered law enforcement and national security agencies) or any other language suggesting that it is a refinement of the law-enforcement exceptions, rather than an additional restriction on the FTS database.  Finally, reading the legal process clause to immunize all firearms trace data from disclosure in judicial proceedings avoids absurd results.  "Under [Baltimore's] strained construction of the statute, the portion of the databases in law enforcement's hands would be 'immune from legal process,' but the remaining portion of the databases, the extensive data not produced to law enforcement, would be accessible to anyone willing to pay for it," *City of Chicago III*, 423 F.3d at 781.  Baltimore suggests that the Rider was structured to immunize from legal process only data in the possession of state, local, or federal law-enforcement agencies because that data "is more expansive and sensitive than what would be provided to members of the public under FOIA or a state analogue."  Dkt. 35-1 at 24 n.7.  But that contention is unsupported by anything in the record.

Because the 2012 Rider prohibits this Court from entering any order that would compel the Bureau to release firearms trace data, it is an independently sufficient ground to grant the Bureau's motion for summary judgment.  But even without that additional step, the immunity from legal process clause confirms that Congress intended the restriction on appropriations to apply literally and broadly, and it did not contemplate that the Bureau would disclose covered records when the required agency expenditures would be de minimis or when the Treasury would be made whole (or close to whole) through the collection of user fees.  As the Seventh Circuit has explained: "Prior to the rider, a requesting party could obtain the information through ATF or the courts.  In the [Rider], Congress blocked both avenues of relief by stripping ATF and

the courts of the ability to act on the public's requests, effectively exempting the information

from disclosure." *City of Chicago III*, 423 F.3d at 782; *accord Everytown for Gun Safety*, 984

F.3d at 40.

      2.      *The Rider Requires that Firearms Trace Data be Withheld from the Public in such a Manner as to Leave No Discretion to the Bureau*

Having determined that the Rider "specifically exempt[s]" firearms trace data "from

disclosure," 5 U.S.C. § 552(b)(3), the Court must determine whether it also satisfies either of

subsection 552(b)(3)(A)'s disjunctive conditions.  A withholding statute satisfies subsection (A)

"if the statute [i] affords the agency no discretion on disclosure, or [ii] establishes particular

criteria for withholding the data, or refers to the particular types of material to be withheld."

*Baldridge v. Shapiro*, 455 U.S. 345, 352–53 (1982).  For the reasons explained above, the Rider

satisfies the first of these conditions, and, thus, the Court need not go any further.  The Rider's

"funding restriction deprives ATF of any discretion" to disclose firearms trace data to the public.

*City of Chicago III*, 423 F.3d at 781.  It therefore satisfies subsection 552(b)(3)(A)(i).

      3.      *The Rider is a Withholding Statute Notwithstanding its Lack of a Specific Citation to Exemption 3*

Although the Rider precludes the Bureau from publicly disclosing firearms trace data, it

lacks a specific citation to Exemption 3, as required by the OPEN FOIA Act.  *See* 5 U.S.C.

§ 552(b)(3)(B).  According to Baltimore, that omission resolves this case.  Dkt. 35-1 at 27–28.

The Bureau disagrees.  It characterizes the OPEN FOIA Act's specific-citation requirement as a

background principle of interpretation that cannot override the plain meaning of the Rider.  Dkt.

33 at 22–23.

In *Everytown for Gun Safety*, 984 F.3d 30, the Second Circuit faced the same tension

between the Rider's anti-disclosure language and the OPEN FOIA Act's specific-citation

requirement.  In resolving that tension, the court invoked the Supreme Court's decision in

*Dorsey v. United States*, 567 U.S. 260 (2012), for the proposition that "[a]n earlier-enacted statutory requirement cannot prevent the 'plain import' or 'fair implication' of a later-enacted statute from taking effect." 984 F.3d at 34 (citation modified). Because the court concluded that "the plain import or fair implication of the 2012 Tiahrt Rider is to exempt FTS data from FOIA disclosure," *id.* at 39 (citation modified), it held that the Rider constitutes an Exemption 3 statute, notwithstanding its failure to use the magic words required by the OPEN FOIA Act, *id.* at 42.

The Court agrees that "the specific-citation requirement of the OPEN FOIA Act does not dictate the outcome in this case," *id.* at 39, and that the Supreme Court's decision in *Dorsey* explains why. In *Dorsey*, the Supreme Court addressed whether the Fair Sentencing Act's new, lower mandatory-minimums applied to pre-Act offenders who had incurred criminal liability under the older Anti-Drug Abuse Act, which carried harsher penalties. 567 U.S. at 271–72. To resolve that question, the Court had to consider the effect of an 1871 saving statute, 1 U.S.C. § 109, which provides that a new criminal statute that repeals an older criminal statute shall not change the penalties incurred under that older statute "unless the repealing Act shall so expressly provide." *Id.* at 272. The Fair Sentencing Act did not contain an express statement providing that its penalties applied to pre-Act offenders, as required by the 1871 saving statute. *Id.* at 273–74. Despite that omission, the Court concluded that Congress "intended the Fair Sentencing Act's new, lower mandatory minimums to apply to the post-Act sentencing of pre-Act offenders." *Id.* at 281.

The Supreme Court explained that the 1871 saving statute created a "background principle of interpretation," not a drafting requirement binding on future Congresses. *Id.* at 275. That is because "statutes enacted by one Congress cannot bind a later Congress, which remains free to repeal the earlier statute, to exempt the current statute from the earlier statute, to modify

the earlier statute, or to apply the earlier statute but as modified." *Id.* at 274 (first citing *Fletcher v. Peck*, 10 U.S. (6 Cranch) 87, 135 (1810); and then citing *Reichelderfer v. Quinn*, 287 U.S. 315, 318 (1932)).  The later Congress "remains free to express any such intention either expressly or by implication as it chooses." *Id.*  Accordingly, "the plain import of a . . . later enactment governs, *regardless* of its compliance with any earlier-enacted requirement of an express reference or other 'magical password.'" *Id.* (emphasis in original) (quoting *Lockhart v. United States*, 546 U.S. 142, 149 (2005) (Scalia, J., concurring)).

*Dorsey* simply applied the well-established rule that "one legislature cannot abridge the powers of a succeeding legislature," *Fletcher*, 10 U.S. at 135, including the legislature's "power to make its will known in whatever fashion it deems appropriate," *Lockhart*, 546 U.S. at 148 (Scalia, J., concurring); *see also United States v. Winstar Corp.*, 518 U.S. 839, 873 (1996) (echoing *Fletcher*'s reasoning); *Marcello v. Bonds*, 349 U.S. 302, 310 (1955) (recognizing Congress' power to supersede a prior enactment without "employing magical passwords"); Authorization for Continued Hostilities in Kosovo, 24 Op. O.L.C. 327, 341–46 (2000) (applying *Fletcher*'s reasoning to a magic-words requirement in the War Powers Resolution).  The same is true for the OPEN FOIA Act, which like any other law cannot dictate how a future Congress may express its intent and can, at most, establish a background interpretative norm that might inform—but cannot control—how a later enacted statute is understood.  Strictly applied, the OPEN FOIA Act would override the plain meaning of a later enacted statute—even if, as here, the later statute unambiguously exempted information from FOIA—thereby swapping the intent of the 2009 Congress for that of a subsequent Congress.  That is precisely the type of limitation on the legislative discretion of a subsequent Congress that *Dorsey* rejected.  A prior statute, *Dorsey* explained, "cannot justify a disregard of the will of Congress as manifested, either

expressly or by necessary implication, in a subsequent enactment." 567 U.S. at 274 (emphasis

omitted) (quoting *Great N. R. Co. v. United States*, 208 U.S. 452, 465 (1908)).

According to Baltimore, "the concerns that animated [*Dorsey*] are not present here"

because "[n]othing in section 552(b)(3)(B) limits or binds Congress." Dkt. 35-1 at 33. But like

the express-statement rule in *Dorsey*, the OPEN FOIA Act purports to control how future

Congresses express their will. Had the OPEN FOIA Act provided instead that "a nondisclosure

statute shall not exempt matters from section 552(b)(3)(A) unless it specifically cites to section

552," it would mirror the structure of the express-statement rule at issue in *Dorsey* and be non-

binding for the same reasons. *See Dorsey*, 567 U.S. at 274 (a later Congress may "exempt the

current statute from the earlier statute" and "express any such intention either expressly or by

implication as it chooses"). Congress cannot accomplish the same impermissible effect merely

by enacting the specific-citation rule as a requirement of Exemption 3.

Baltimore's argument, moreover, turns on an unduly formalistic reading of FOIA and the

OPEN FOIA Act. For the reasons explained above, the Congress that enacted the Rider clearly

intended to preclude the Bureau from disclosing the records at issue, and there is no doubt that

the views of the subsequent Congress are controlling. Thus, at most, Baltimore's argument

suggests that the Bureau incorrectly invoked Exemption 3—since Congress did not employ the

magic words—and, instead, should have simply invoked the Rider as an independent basis for

withholding the records. Even recognizing that implied repeals are disfavored, the Court is

persuaded that the 2012 Rider precludes release of the records at issue. In short, whether

referred to as an Exemption 3 withholding or a Tiahrt Rider withholding, the result is the same,

and the Bureau's invocation of Exemption 3, rather than the Tiahrt Rider as a standalone basis

for declining the City's request, is harmless.

Consistent with *Dorsey*, *Everytown for Gun Safety*, and the plain language of the 2012 Rider, the Court concludes that the Rider constitutes a withholding statute, despite its omission of a specific citation to Exemption 3.  As the Court has already explained, the Rider's text carefully shields firearms trace data from public disclosure by depriving governmental entities in possession of such data of any discretion to disclose that data and stripping courts of the authority to order such disclosure.  Although unnecessary to sustain the Court's holding, the Rider's legislative evolution only reinforces the Court's reading of the 2012 Rider.

Prior to the enactment of the OPEN FOIA Act, Congress included the Rider in six different appropriations statutes.  In each iteration, the Rider made appropriations wholly unavailable to publicly disclose firearms trace data, without regard to funding source or fiscal year, and the 2005, 2006, 2008, and 2009 Riders included the same legal process clause found in the Rider today.  And following the Seventh Circuit's decision in *City of Chicago III*, lower courts—including those in this District—uniformly interpreted the Rider to bar disclosure of firearms trace data pursuant to FOIA.  *See Everytown for Gun Safety*, 984 F.3d at 41 ("Congress continued to use this antidisclosure language throughout the 2000s and courts uniformly held that the Tiahrt Riders exempted FTS data from FOIA disclosure."); *see, e.g.*, *Singh v. F.B.I.*, 574 F. Supp. 2d 32 (D.D.C. 2008); *Miller v. U.S. Dep't of Just.*, 562 F. Supp. 2d 82 (D.D.C. 2008); *Antonelli v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, No. 04-1180, 2006 WL 3747312 (D.D.C. Dec. 18, 2006); *Watkins v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, No. 04-800, 2005 WL 2334277 (D.D.C. Sept. 1, 2005).[2]  Against this legal

---

[2] In *Beretta*, 429 F. Supp. 2d 517, the district court interpreted the "legal process" clause of the then-operative Rider such that it did not bar the use of firearms trace data in civil litigation, where that data had been previously obtained by subpoena.  However, *Beretta* did not involve a FOIA request and did not opine on whether the 2006 Rider qualified as an Exemption 3 statute.

backdrop, it beggars belief to suppose that Congress enacted the 2010 and 2012 Riders—both of which contained two additional restrictions on the disclosure of firearms trace data that the 2009 Rider did not—with the intention of opening up firearms trace data to public disclosure. "The interceding enactment of the OPEN FOIA Act's specific-citation requirement does not overcome the elementary principle that Congress uses the same language to accomplish the same objective." *Everytown for Gun Safety*, 984 F.3d at 42.

The Rider's text and statutory history and the weight of persuasive authority all "point clearly" in one direction: the Rider exempts firearms trace data from disclosure. *Dorsey*, 567 U.S. at 275 (before interpreting a subsequent statute to override an express-statement rule, courts must "assure themselves that ordinary interpretative considerations point clearly in that direction"). These "ordinary interpretative considerations," *id.*, are more than sufficient to show that the 2012 Congress intended to overcome the background principle established by the 2009 Congress that Exemption 3 statutes should specifically cite to section 552(b)(3). The Court may not "disregard . . . the will of Congress as manifested" in the 2012 Rider, the more recent statute. *Id.* at 274.

**B.    Baltimore's FOIA Request Falls Within the Rider's Prohibition on Disclosure**

Having determined that the 2012 Tiahrt Rider is an Exemption 3 statute (or the equivalent), the only remaining question is whether Baltimore's FOIA request falls within the Rider's prohibition on disclosure. *See Labow*, 831 F.3d at 527. For the reasons explained above, it does. Baltimore presses only one additional argument: it maintains that its FOIA request falls within the Rider's publication exception, which authorizes "the publication of annual statistical

---

*See Everytown for Gun Safety*, 984 F.3d at 41 n.6 (explaining why *Beretta* does not alter the consensus of courts finding that the Tiahrt Rider is an Exemption 3 statute).

reports . . . or statistical aggregate data regarding firearms traffickers and trafficking channels, or firearms misuse, felons, and trafficking investigations," 18 U.S.C. § 923 note.  Dkt. 35-1 at 38–39.  The Court is unpersuaded.

The publication exception, or Subpart C, provides as follows:

> [The Rider] shall not be construed to prevent . . . (C) the publication of annual statistical reports on products regulated by the Bureau of Alcohol, Tobacco, Firearms and Explosives, including total production, importation, and exportation by each licensed importer (as so defined) and licensed manufacturer (as so defined), or statistical aggregate data regarding firearms traffickers and trafficking channels, or firearms misuse, felons, and trafficking investigations[.]

18 U.S.C. § 923 note.  Baltimore argues that each of the four parts of its FOIA request "can be produced as 'statistical aggregate data regarding firearms . . . trafficking channels, or firearms misuse.'"  Dkt. 35-1 at 39.  It further argues that its intent to make firearms trace data "available to the public" satisfies Subpart C's publication requirement.  *Id.* at 40; *see* Dkt. 35-3 at 4 (Mavronis Decl. ¶ 10).  Baltimore relies on the Ninth Circuit's decision in *Center for Investigative Reporting v. U.S. Dep't of Just.* ("*CIR*"), which read the publication exception to authorize the Bureau to release to FOIA requesters firearms trace data in the form of "statistical aggregate data" whenever doing so would make such data "generally known to the public," 14 F.4th 916, 935 (9th Cir. 2021).  The Bureau, on the other hand, relies on the Second Circuit's decision in *Everytown for Gun Safety*, 984 F.3d at 43–44 & n.9, which rejected the Ninth Circuit's interpretation of the publication exception.  Dkt. 33 at 27–28.

The Bureau and the Second Circuit offer the better reading of the Rider's publication exception.  The Rider's text, purpose, and legislative history, as well as background FOIA principles, indicate that the "publication exception allows the ATF, at its own initiative, to release statistical aggregate data regarding firearms misuse, felons, and trafficking investigations to the public."  *Everytown for Gun Safety*, 984 F.3d at 44.  It does not, as Baltimore argues,

authorize the Bureau to release aggregate firearms trace data to any FOIA requester who intends to spread such data amongst the public.

By way of background, the House Appropriations Committee proposed the publication exception in the 2008 Tiahrt Rider because it was "concerned that the previous year's language ha[d] been interpreted to prevent publication of a long-running series of statistical reports on products regulated by ATF." H.R. Rep. 110-240, at 63 (2008). The publication exception clarified "that those reports [could] continue to be published in their usual form." *Id.* at 63. To be sure, "the text of a law controls over . . . legislative intentions unmoored from any statutory text," and the Court "may not replace the actual text with speculation as to Congress' intent." *Corner Post, Inc. v. Bd. of Governors of Fed. Reserve Sys.*, 603 U.S. 799, 815 (2024) (citation modified). But here, the stated "legislative intention[]" is firmly moored to the statutory text. It is, of course, that text that is controlling.

To start, the ordinary meaning of "publication" does not encompass the production of records to an individual FOIA requester. The Rider does not define "publication," so the Court turns to dictionaries to determine the word's plain meaning. The word "publication" signals the release of prepared information to the public, usually in print or electronic form. *See, e.g.*, Merriam-Webster's Collegiate Dictionary (2025) (defining "publishing" as "the business . . . of the commercial production and issuance of literature, information, musical scores or sometimes recordings, or art"); Webster's Third New International Dictionary (1993) (defining "publication" to mean "communication to the public" or "the act of issuing copies (as of a book, photograph, or musical score) for general distribution to the public"). Because FOIA requests are addressed on a person-by-person basis, fulfilling an individual FOIA request falls outside the plain meaning of "publication." *See Everytown for Gun Safety*, 984 F.3d at 44 n.9.

Baltimore's reading is also difficult to square with the distinction that FOIA itself draws between "disclosure" and "publication."  FOIA consistently uses "disclosure" to describe an agency's production of records to an individual requester, *see, e.g.*, 5 U.S.C. § 552(a)(8), (b)(3), (b)(6), (c)(1), and uses "publication" or "publish" in FOIA to refer to an agency's release of information to the general public, *see, e.g., id.* § 552(a)(1) (providing that "[e]ach agency shall separately state and currently publish [specified information] in the Federal Register for the guidance of the public").  *See also CIR*, 14 F.4th at 944–45 (Bumatay, J., dissenting).  So, if the ATF fulfilled Baltimore's FOIA request, it would *disclose* statistical aggregate data about firearms misuse to Baltimore; it would not *publish* the data to the general public.[3]

*CIR*, notably, did not conclude otherwise. 14 F.4th at 935 n.16. ("None of this means that ATF, specifically, is 'publish[ing] information.'").  Instead, it suggested that the publication exception is "agnostic" about who publishes statistical aggregate firearms trace data.  *Id.* ("For though the Tiahrt Rider permits the use of funds to enable 'publication' it never states that such 'publication' must come at the direct hand of ATF.").  But although the publication exception does not explicitly name the entity who may publish statistical aggregate data, it must be read in light of its status as an exception to a restriction on the ATF's use of appropriated funds.  Given that statutory context, the publication exception merely authorizes the ATF to use appropriated funds to publicize annual statistical reports or statistical aggregate data about the products it

---

[3] True, "once one requester gets access to information under FOIA, it is treated as generally *publicly available*." *Wash. Lawyers' Comm. for C.R. & Urb. Affs. v. U.S. Dep't of Just.*, 145 F.4th 63, 72 (D.C. Cir. 2025) (emphasis added); *see also Nat'l Archives & Recs. Admin. v. Favish*, 541 U.S. 157, 174 (2004) ("once there is disclosure [under FOIA], the information belongs to the general public").  But that *legal consequence* does not eviscerate the *semantic distinction* between the "disclosure" (or release) of records to FOIA requesters on a requester-by-requester basis and an agency's "publication" of materials for general public consumption.  *See Everytown for Gun Safety*, 984 F.3d at 44 n.9.

regulates.  The Court is unpersuaded that the ATF's authority to use appropriated funds turns on the possible future actions of third parties.

One additional consideration tips the scale decidedly in favor of the Bureau's construction of the Rider.  Under the noscitur a sociis canon of construction, the Court must construe individual statutory terms in light of "the company [that they] keep[]."  *Gustafson v. Alloyd Co.*, 513 U.S. 561, 575 (1995).  Here, the relevant text creates a proviso for "the publication of annual statistical reports on products regulated by the Bureau . . . or statistical aggregate data regarding firearms traffickers and trafficking channels, or firearms misuse, felons, and trafficking investigations."  18 U.S.C. § 923 note.  In short, the proviso applies to the "publication" of "statistical reports" and the "publication" of "statistical aggregate data." Because the publication of statistical reports is best construed (and, indeed, only plausibly construed) to refer to the public release of "reports" prepared by the ATF for public consumption, it follows that the publication of "statistical aggregate data" carries a similar meaning—that is, it refers to the public release of aggregate data prepared or collated by the ATF for public consumption.

Because the publication proviso authorizes only the ATF to publish statistical reports and statistical aggregate data, it does not cover Baltimore's FOIA request.  Accordingly, the entirety of Baltimore's FOIA request is barred by the Rider, and the Bureau properly withheld the responsive records.  Given this conclusion, the Court need not address the parties' arguments regarding whether Baltimore's FOIA request would require the Bureau to create new records.

**CONCLUSION**

For the foregoing reasons, the Bureau's motion for summary judgment, Dkt. 33, is hereby

**GRANTED**, and Baltimore's cross-motion for summary judgment, Dkt. 35, is hereby **DENIED**.

**SO ORDERED**.

/s/ Randolph D. Moss
RANDOLPH D. MOSS
United States District Judge

Date:  January 20, 2026